*FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
_____
                              :
UNITED STATES OF AMERICA,     :
                              :    Criminal No.: 10-646 (FLW)
              Plaintiff,      :
                              :    BENCH MEMORANDUM
     v.                       :
                              :
WAYNE R. BRYANT,              :
                              :
              Defendant.      :
_____:
```

**WOLFSON, District Judge**:

Between the relevant years of 2004 to 2006, Defendant Wayne Bryant ("Bryant") was a prominent state senator who represented the 5th Legislative District, which included the City of Camden.  During those years, Bryant was also an equity partner at the law firm, Zeller & Bryant LLP (the "Zeller Firm").  In this criminal case, the indictment (the "Indictment") charges Bryant with honest services mail fraud, bribery and extortion.[1]  Essentially, the Government accuses Bryant of taking, or failing to take, official action to benefit certain entities related to Cherokee Investment Partners[2]

_____

[1]
    Co-defendant Eric Wisler was also charged in the Indictment. However, regrettably, Wisler passed away during the pendency of this case.  As a result, the Court dismissed the charges against him on September 22, 2011.

[2]
    "Cherokee Investment Partners" was the parent company of various entities formed for the purpose of redeveloping property

("Cherokee") in exchange for a stream of bribe payments, disguised as a legal retainer agreement, negotiated and paid by co-defendant Eric Wisler, Cherokee's lead counsel in New Jersey.  For nearly a month, the Court held a bench trial wherein I heard testimony from numerous witnesses and viewed voluminous exhibits admitted in evidence.  However, based on all the evidence, I find that the Government has not proved beyond a reasonable doubt that Bryant intended to take certain official action at the behest of Wisler, a necessary element of all the charges against Bryant.  Because of this failure, I find Bryant **NOT GUILTY**[3] of all counts lodged against him in the Indictment.  The following are the Court's findings of fact and conclusions of law.[4]

---

in New Jersey.  The Court will refer to them collectively as "Cherokee."

[3]

    Bryant pled not guilty to all the charges against him.  A plea of not guilty is the "functional equivalent" of a Rule 29 motion in a bench trial. <u>United States v. Atkinson</u>, 990 F.2d 501, 503 (9th Cir. 1993) (en banc); <u>see also</u> <u>Hall v. United States</u>, 286 F.2d 676, 677 (5th Cir. 1961); <u>United States v. Grace</u>, 367 F.3d 29, 34 (1st Cir. 2004).  Accordingly, Bryant need not separately file a Rule 29 motion before the Court.

[4]

    Pursuant to Rule 23(c), the parties request that I make specific findings of fact and conclusions of law, and in that connection, the Government and Defendant submitted their respective proposed findings of fact and conclusions of law.

**FINDINGS OF FACT**

Prior to trial, Bryant waived his right to a jury;
consequently, the Court conducted a bench trial, which began on
January 31, 2012, and concluded on February 28, 2012.  The relevant
facts surrounding the relationship between Bryant, Wisler and
Cherokee are detailed below.

From 1995 to 2008, Bryant served as a New Jersey State
Senator, representing, among other towns in his districts, the City
of Camden.  During the relevant years, while serving as a Senator,
Bryant sat on various state governmental committees.[5]  In that
respect, many regarded Bryant as one of the most influential public
officials in southern New Jersey.  (Primas Tr. at 43:1-3.)  At the
same time, Bryant was also one of two equity law partners at the
Zeller Firm, located in Cherry Hill, New Jersey.

Cherokee was an investment company based in Raleigh, North
Carolina, which specialized in investing in, and developing,
brownfield sites[6].  (Tr. V.2, p. 166-167.)  From 2004 to 2006,

---

[5]

Among others, those committees included: Intergovernmental
Relations Committee from 2003 to 2008; Senate Budget and
Appropriations Committee from 2002 to 2004; Joint Budget Oversight
Committee from 2002 to 2004; and Budget and Appropriations Committee
and the Joint Budget Oversight Committee from 2004 to 2006.

[6]

"A Brownfield Redevelopment is the cleanup and remediation of
a property that has historical contamination on it, and then the

Cherokee invested in, and was responsible for overseeing, various redevelopment projects in New Jersey, including in the Cramer Hill neighborhood of Camden, in the town of Pennsauken, and in the Meadowlands region.  (Id. at p. 148.)  Cherokee created Cherokee Northeast to operate and manage Cherokee's brownfield redevelopment projects in New Jersey.  (Tr. V.2, p. 166-167.)

Cherokee's Cramer Hill project was an estimated $1.2 billion redevelopment of the Cramer Hill neighborhood.  (Primas Tr. at 59:12-13.)  The project involved remediating a 120-acre landfill and converting a part of that landfill into a golf course, as well as erecting new housing and a commercial retail center.  (Tr. V.2, p. 171.)  In December 2003, Cherokee was selected by the Camden Redevelopment Agency ("CRA"), headed by Melvin Primas, Jr., as the lead developer for the redevelopment of Cramer Hill.  (GX 2013.) Anselm Fusco, a senior vice-president at Cherokee Northeast, managed the Camden project.[7]  (Id. at p. 173.)

reuse of that property in a real estate project."  (Tr. V.2, p. 166.)

[7]    Various entities and their employees were hired by Cherokee to perform work on the Cramer Hill project.  At trial, the following consultants testified:   Donald Sico was hired as a community relations consultant (Tr. V.3, p. 6.); Brad Brewster and Andrew Sinclair of Princeton Public Affairs were registered lobbyists retained to assist Cherokee on legislative and executive branch matters concerning Cherokee's projects in southern and northern New Jersey (Id. at p. 7.); Jim McQueeny and Rich Ochab of Winning

-4-

The Pennsauken project involved the development of a golf course and a mix of residential, commercial, and retail property in Pennsauken Township, which was located outside of Bryant's legislative district.  (Id. at p. 172.)  Cherokee's role as the developer in Pennsauken was announced in May 2004, (GX 2051), and by June 2005, Cherokee had executed a redevelopment agreement with the township.  (Tr. V.3, p. 41.)

Cherokee was also involved in redevelopment projects in the Meadowlands district, located in northern New Jersey.  The plan for one of the projects, referred to as EnCap Phase I, was to acquire various parcels of land that made up the site, remediate the landfills on that site, and develop the land into a mixed use area, including a golf course.  (Tr. V.2, p. 10.)  The EnCap Phase II development, which was to occur in North Arlington, New Jersey, was a 100-acre proposed expansion of EnCap Phase I. (Id. at p. 111.)  Phase II included a mix of residential, recreational and commercial uses.  (Id.)  However, by 2007, Phase II had stalled because of litigation over the redevelopment agreement that Cherokee had entered into with North Arlington.  (Tr. V.4, p. 122.)

_____

Strategies were hired to be responsible for public relations (Id. at p.8.); and, as set forth in more detail later in this Opinion, Joseph Salema was hired to provide political consulting services to Cherokee on the Cramer Hill and Pennsauken projects.

In order to navigate the legal and political waters in New Jersey, Cherokee hired Eric Wisler, who was an equity partner at the law firm of DeCotiis, Fitzpartick, Cole & Wisler (the "DeCotiis Firm"). Wisler became the lead lawyer for Cherokee on the various New Jersey development projects. (Tr. V.1 p. 52.) Among his many functions, Wisler assisted Cherokee in forming strategies and important decisions, and was responsible for overseeing the projects' various governmental and state agency relationships. (Tr. V. 2, p. 179; Tr. V. 4, pp. 23; 87-88; Tr. V.5, pp. 17, 57.)

By spring of 2004, accordingly to Fusco, Cherokee sought out Bryant's support, particularly for the Cramer Hill and Pennsauken projects, because Fusco believed that those projects must "be consistent with the desires of elected officials, local and state officials, in whose regions, in whose districts they fell." (Tr. V.2, pp. 188-189.) And, it was "impractical to try and advance projects that were not supported by elected officials where the projects were taking place." (Id. at pp. 189-190.) Moreover, Cherokee acknowledged that Bryant's support of the projects was crucial in the process of obtaining certain approvals from the Planning Boards and City Councils. (Tr. V.3, p. 94.) Also, Cherokee understood that elected officials, particularly Bryant, must support the proposed project in Cramer Hill to ensure its

success.  (Tr. V.4, p. 22.)  In that connection, during the trial, the Government offered testimony regarding various efforts Wisler and the Cherokee team undertook to ensure that the Cherokee projects would be supported by New Jersey state legislators, and Cherokee spent tremendous resources to lobby for laws that would benefit those projects, e.g., state grants and funding.  (See GX 2013; Tr. V.3, p. 25.)  The pertinent aspects of such testimony will be discussed in further detail later in this Opinion.

To garner support from Bryant and other elected officials, Wisler enlisted Joseph Salema.  Salema was a consultant who provided governmental, political, real estate and strategic advice.  (Tr. V.9, p. 148.)  Indeed, Salema was sought out to lobby elected officials because of his long history in southern New Jersey politics and government.  (Tr. V.10, pp.22-23.)  In particular, Salema had a relationship with Bryant which began when Salema managed Bryant's first campaign for public office in late 1970. (Tr. V.9, pp. 150-51.) Based on Salema's knowledge of the political climate in southern New Jersey, an important aspect of his duties was to serve as a liaison and lobbyist on behalf of Cherokee to elected officials, including Bryant.  (Id. at pp. 155-158.)  Wisler entrusted Salema with the responsibility to communicate with Bryant regarding the Cramer Hill and Pennsauken projects.  (Tr. V.10,

p.24.)

Due to the nature of the Cramer Hill project, it was estimated that hundreds of families were slated to be relocated, and by May 2005, the project faced significant public opposition centered around eminent domain and concerns over relocation of residents. (Tr. V.3, pp. 47, 57, 125.)   Around that time, Wisler contacted Salema to arrange a meeting with Bryant.   (Tr. V.10, p. 77.) According to Salema, Wisler only indicated that he wanted to touch base with Bryant and to familiarize the Senator with Cherokee. (Id. at p. 80.)   Pursuant to that request, Salema called Bryant's office to schedule a meeting, which took place on June 8, 2004, at the Zeller Firm.

At that meeting, Bryant, Wisler and Salema were present.  (Id. at p. 86.)   Salema testified that prior to the meeting, Bryant and Wisler were unfamiliar with each other.   The meeting began with "political small talk about what was going on politically in New Jersey." (Id. at 87.)   Bryant and Wisler also discussed the general nature of their law firms and the types of work their respective firms handled.   (Id. at 88.)   Salema did not recall any specific conversations regarding Cramer Hill or the opposition that project was facing.   (Id. at pp. 89, 96.)   However, Salema recalled that Wisler informed Bryant that Cherokee's expertise in brownfield

reclamation and redevelopment was known internationally, and based on that expertise, it was attempting to develop a "joint venture relationship" with the United States Conference of Mayors ("USCM"). (Id. at pp. 89-91.) Wisler went on to ask Bryant whether Bryant and his firm would be interested in assisting Cherokee in that venture. (Id. at p. 92.)  In that connection, Wisler inquired as to the amount of fees the Zeller Firm would be interested in receiving for that type of work.  According to Salema, Bryant discussed that the firm "would be interested in an $8,000 a-month-fee."  (Id. at p. 94.)  Wisler responded that he needed to speak with others before they could commit.  (Id.)

Salema testified that his understanding from the meeting was that Wisler's request to hire the Zeller Firm was more about retaining Bryant as a liaison for Cherokee to urban areas; essentially, Salema's impression was that Wisler wanted to "trade" on Bryant's reputation.  (Id. at p. 105.)  However, importantly, Salema could not recollect any discussions during the meeting regarding whether the Zeller Firm would be interested in working with Cherokee's brownfield projects in New Jersey.[8]  (Id. at p. 97.)

---

[8]

    As discussed further in this Opinion, although Salema was a witness for the Government, the Government vigorously attacks Salema's credibility.  In that regard, the Government introduced certain evidence which, it argues, tends to undercut Salema's

Salema testified that after the meeting, he did not have any conversations with Wisler regarding the subject matter discussed at the meeting, and Salema did not recall having any conversations with Bryant about the possibility of the Zeller Firm doing work for Cherokee.  (Id. at p. 113.)

On August 27, 2004, a Retainer Agreement was executed by Wisler and sent to the Zeller Firm for Bryant's signature.  (See GX 34A.)  Other members on the Cherokee team, such as Fusco, were "cc'ed" on the Retainer Agreement.  (GX 34.)  After receiving the agreement at the firm, on September 7, 2004, Bryant, by phone, directed Allen Zeller, an equity partner of the Zeller Firm, to sign the agreement using Bryant's name.  (Tr. V.2, pp. 11, 39, 62.)  By cover letter dated September 21, 2004, the fully executed Retainer Agreement was returned to Wisler,(see GX 34), and a copy of the executed agreement was also sent to Fusco and Salema.  (Tr. V.1, p. 65.)

Pursuant to the terms of the Retainer Agreement, the Zeller Firm agreed to provide, inter alia, legal assistance with respect to "real estate, condemnation, land use, bank finance and litigation matters on EnCap's Meadowlands Project - Phase II, as well as the

---

testimony; moreover, the Government referred to the grand jury transcripts in an attempt to demonstrate that Salema testified inconsistently.

[mixed-use] redevelopment project to be undertaken in the Borough of North Arlington." (GX 34, p. 2.) In addition, the agreement states that "Cherokee Northeast is managing projects in Asbury Park, Elizabeth and will, in the near future, be designated as the manager for a project in St. Mary's, Georgia. There may be similar opportunities to work" with the Zeller firm on those projects. (Id. at pp. 2-3.) Finally, the agreement provides that "[Cherokee] has recently executed a Partnership Agreement with the U.S. Conference of Mayors and, pursuant to such Agreement, has been designated as the exclusive brownfield redevelopment firm for projects that are facilitated through the U.S. Conference of Mayors." (Id. at p.3.) Wisler indicated on the agreement that there might be future legal opportunities for the Zeller Firm arising from that relationship with the USCM. (Id.) In connection with all of the above contemplated services, the agreement reflected a retainer fee of $8,000 payable to the Zeller Firm on a monthly interval. (Id.)

Wisler requisitioned the first $8,000 payment to Bryant, payable by the DeCotiis Firm, on August 24, 2004, three days before Wisler purportedly drafted and sent out the Retainer Agreement to the Zeller Firm. It appears that this particular check was attached to the Retainer Agreement that was mailed to the Zeller Firm on August 27, 2004. (See GX 1201; 34A, 1200) The Government points out

that, while on their face the invoices for August through December 2004 appear to be from the Zeller Firm to the DeCotiis Firm, they were actually drafted by Wisler's assistant and those invoices were never sent to the Zeller Firm.  (Tr. V.1, pp. 69, 71, 73, 170.) Subsequent invoices –  until the termination of the agreement in 2006 – were prepared by Bryant's assistant at the Zeller Firm, which invoices contained standard block-billing language used by the firm. (Tr. V.1, pp. 143-144.)

Following the execution of the Retainer Agreement, Bryant and Wisler did not communicate directly and no substantial services were requested of or rendered by the Zeller Firm.  Indeed, there is no dispute that the Zeller Firm did little or no work for Cherokee pursuant to the Retainer Agreement.  The Zeller Firm received the $8,000 retainer fee for twenty-five months, for a total of $192,000. (Tr. V.1, p.155; GX1200.)  Those funds were deposited into the Zeller Firm's business account. (Id. at p. 167.)

At trial, the Government detailed a series of official acts that were purportedly requested by Wisler, mostly through Salema, of Bryant, to benefit Cherokee.  The Government contends that those requests had nothing to do with any legitimate work pursuant to the Retainer Agreement.  Without delving into the details at this juncture, generally, those requests dealt with various pending

-12-

bills, or proposed bills, in the state legislature that would affect Cherokee. According to the Government, Wisler intended to reach out to Bryant to persuade him to vote in favor of or support certain bills, and take actions against those that would negatively affect Cherokee's projects, particularly Cramer Hill.[9]  The Government also outlined a series of official acts allegedly taken by Bryant to benefit Cherokee that it argues were performed in exchange for the stream of payments paid pursuant to the Retainer Agreement.  For example, in mid 2005, Bryant voted on several occasions in favor of bills, which were unanimously passed by the Senate, authorizing a grant of $244 million in loans to benefit EnCap Phase I  (GX102-102B; 103-103B; 103D; 103F-103G; 103-I; 113-113B; Tr. V.9, p.93.); and Bryant voted in favor of Senate Bills 1831 and 277, both of which benefitted Cherokee.

---

[9]     Examples of those requests include: Wisler drafted a bill to provide state funding for Cherokee's South Jersey projects and EnCap Phase 2 (GX 2044); Wisler asked Salema to "touch base" with Bryant for support of Cherokee's redevelopment on Petty's Island, which was a part of the Pennsauken project (GX 2047); Wisler inquired of Salema whether Salema would contact Bryant on two proposed amendments to the Camden Economic Recovery Act (GX 2053); and an email sent by Wisler to Salema and others urging them to "touch base" with Bryant regarding a potentially negative piece of legislation proposed by Assemblywoman Nilsa Cruz Perez that would raise the relocation assistance provided to Cramer Hill residents compelled to move by eminent domain (GX 2059).  The impact of these particular requests on the charges against Bryant will be discussed further, infra.

Of particular importance, the Government extensively highlighted Bryant's vote during a July 7, 2005 meeting of the Joint Budget Oversight Committee ("JBOC') to transfer $37 million to the City of Camden to balance the City's $36 million budget deficit, and that the additional $1 million of that fund was to be appropriated to the CRA to pay for the agency's expenses, including legal bills related to the Cramer Hill project. With respect to the $1 million, Primas, who was also a personal friend of Bryant, testified that he had requested state funding from Bryant in order to pay CRA expenses.[10] (Primas Tr. at pp. 101, 177.)

In September 2006, the New Jersey Attorney General's Office sent a grand jury subpoena to Cherokee. Because the subpoena specifically referenced Senator Bryant, the Retainer Agreement was produced by the DeCotiis Firm pursuant to that request. After reviewing the file related to the agreement at that time, the DeCotiis Firm decided to terminate it immediately. (Tr. V.2, p. 149.)

By 2008, Cherokee's Cramer Hill project was no longer viable because of opposition from the community, litigations against it,

---

[10]

I note that Primas was not present at trial due to an illness, which ultimately caused his death. Primas' testimony was taken by video and introduced at trial.

and the changing political climate.  Similarly, the Pennsauken project failed to move forward because of, among other reasons, a lack of public financing.  (Tr. V.3, pp. 74-75.)

On September 21, 2010, Bryant was charged in the Indictment with 22 counts, alleging that, from June 2004 to September 2006, Bryant took, or failed to take, certain official acts to benefit Cherokee in exchange for a stream of bribe payments from Wisler – paid pursuant to the Retainer Agreement designed to disguise the true nature of the payments.  Specifically, Counts 1 through 20 relate to Bryant's participation in an alleged scheme with Wisler to commit honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, and Section 2.  Count 21 of the Indictment charges Bryant with soliciting, accepting, and agreeing to accept a stream of corrupt payments from Wisler in violation of 18 U.S.C. § 666(a)(1)(B) and Section 2.  Finally, Count 23 avers that Bryant extorted payments from Wisler under the color of official right in violation of 18 U.S.C. § 1951(a).[11]

## CONCLUSIONS OF LAW

### I.   Legal Precepts

### Honest Services Mail Fraud

To prove mail fraud, the Government must establish that (1)

---

[11]   Count 22 was only charged against Wisler.

the defendant knowingly and willfully participated in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) that in advancing, furthering, or carrying out the scheme, the defendant used the mails or caused the mails to be used.  United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002); United States v. Antico, 275 F.3d 245, 261 (3d Cir. 2001) (citation omitted), abrogated on other grounds by Skilling v. United States, 130 S. Ct. 2896 (2010). Under 18 U.S.C. § 1346, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In Skilling, the Supreme Court considered the scope and constitutionality of § 1346, and held that the statute criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks." 130 S. Ct. at 2928, 2931.  The Court further explained that § 1346 does not cover "undisclosed self-dealing by a public official . . . [such as] the taking  of official action by the [official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id. at 2932. Here, the Government charges Bryant under a bribery theory of honest services fraud.

A bribery theory under § 1346 "requires a *quid pro quo*," United States v. Wright, 665 F.3d 560, 567 (3d Cir. 2012) (quoting

-16-

United States v. Kemp, 500 F.3d 257, 281 (3d Cir. 2007)), "that is,

a specific intent to give or receive something of value in exchange

for an official act." Wright, 665 F.3d at 567-68 (quoting United

States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 404-05 (1999)).

"[A] bribery theory does not require that each *quid*, or item of

value, be linked to a specific *quo*, or official act. Rather, a bribe

may come in the form of a 'stream of benefits.'" Wright, 665 F.3d

at 568 (quoting United States v. Bryant, 655 F.3d 232, 240-41 (3d

Cir. 2011).  An honest services fraud prosecution for bribery after

the Supreme Court's decision in Skilling requires the Government to

prove: (1) that "the payor provided a benefit to a public official

intending that he w[ould] thereby take favorable official acts that

he would not otherwise take," and (2) that "the official accepted

those benefits intending, in exchange for the benefits, to take

official acts to benefit the payor."[12] Wright, 665 F.3d at 568

---

[12] The parties raise an interesting argument regarding the wording of the Third Circuit's recent opinion in Wright.   The Government insists that the intent to influence the public official to take an act "he would not otherwise take" language in Wright applies only to the payor and not the public official.  Arguing otherwise, Bryant claims that the same intent should also apply to the payee; therefore, Bryant advocates that under Wright, the Government must prove that he, as a public official, intended to take, or took, official acts that he otherwise would not have taken but for the bribery scheme.  On this subject, more recently, the Third Circuit in Andrews cited approvingly the exact language as written in Wright.  While the Andrews court did not discuss the

-17-

(citations omitted). "The *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity." Id. (quoting Antico, 275 F.3d at 257); United States v. Andrews, 681 F.3d 509 (3d Cir. 2012).  In a similar vein, the Government may prove a bribery scheme with circumstantial evidence.  Wright, 665 F.3d at 568-69 ("The inducement from the official is criminal if it is implied from his words and actions.").

With respect to the "corrupt intent," "it is enough for the government to present evidence that shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor.  Thus, payments may be made with the intent to retain the [officials'] services on an 'as needed basis,'" Bryant, 655 F.3d at 241, and "[t]he public official need not even perform the official acts if he stood ready to do so having intended to accept a bribe." Wright, 655 F.3d at

_____

issue raised here, it appears that the Third Circuit has adhered to its prior precedent in Wright – without further clarifying or altering – the requisite proof of intent for payee/public official.  Whatever the outcome of the parties' dispute, the Court need not resolve it here, since the Government has failed to prove beyond a reasonable doubt that Bryant had a corrupt intent. This failure is ultimately fatal to its claims and the Court confines its decision to that analysis.  See infra.

568 (citing <u>Bryant</u>, 655 F.3d at 240-41).  The inquiry is "whether the official intended to allow himself to be influenced - not that he was actually influenced in the performance of his duty." <u>United States v. Mosberg</u>, No. 08-678, 2011 U.S. Dist. Lexis 129844, at *43 (D.N.J. Nov. 9, 2011)(citing <u>United States v. Ozcelik</u>, 527 F.3d 88, 95 (3d Cir. 2008)).  To establish a corrupt intent, the Government may present circumstantial evidence of concealment as "clandestine arrangements are clandestine for a reason, presumably a corrupt one." <u>Mosberg</u>, 2011 U.S. Dist. Lexis 129844, at *45.

**Bribery - § 666**

With respect to bribery under § 666, the Government must prove the following elements beyond a reasonable doubt: "1) corrupt solicitation; 2) of anything of value; 3) with the intention of being influenced in connection with any transaction of a local government or organization receiving at least $ 10,000 in federal funds annually; 4) where the transaction involves anything of value of $ 5,000 or more." <u>United States v. Cicco</u>, 938 F.2d 441, 444 (3d Cir. 1991); <u>Brace v. County of Luzerne</u>, 2012 U.S. Dist. LEXIS 81067, at *15 (M.D. Pa. Jun. 12, 2012); 18 U.S.C. § 666(a)(1)(B).  In this case, while Defendant does not concede that the Government has proven the first, second and fourth elements, he nonetheless focuses only on the Government's lack of evidence with respect to the third

element. Indeed, the parties dispute whether Bryant acted corruptly
with the intent to be influenced or rewarded in connection with a
business, transaction or series of transactions of the State of New
Jersey. See Third Circuit Model Criminal Jury Instructions ("Model
Instructions") 6.18.666A1B; see Cicco, 938 F.2d at 444. Therefore,
I will focus on that element, as well.

To act "corruptly" means simply to act knowingly and
intentionally with the purpose either of accomplishing an unlawful
end or unlawful result or of accomplishing some otherwise lawful end
or lawful result influenced by the receipt of the thing of value.
See Model Instructions 6.18.666A1B-2; see United States v. Traitz,
871 F.2d 368 (3d Cir. 1989). Corrupt acts are ordinarily motivated
by a hope or expectation of either financial gain or other benefit
to one's self, or some aid or profit to another. In considering
this element, the Government must prove that the public official
intended, at least in part, to be influenced or rewarded, but,
consistent with the Third Circuit precedent, the Government is not
required to prove that the public official took any particular
action, or that the bribe actually influenced him. See Bryant, 655
F.3d at 240-41. The Government need only prove that the official
corruptly solicited, demanded, accepted or agreed to accept a thing
of value that was, in whole or in part, either influenced or

-20-

rewarded, or both, in exchange for his official action and assistance.  See Id.

**Extortion - Hobbs Act**

To convict a defendant of extortion under the Hobbs Act, the Government is required to prove that the defendant obstructed, delayed, or affected commerce by extortion and that the defendant acted knowingly and willfully. United States v. Saldana, 2012 U.S. App. LEXIS 6433, at *5 (3d Cir. Mar. 30, 2012); see United States v. Driggs, 823 F.2d 52, 54 (3d Cir. 1987) (citing 18 U.S.C. § 1951). As it pertains to this case, the Government must prove beyond a reasonable that 1) Bryant obtained from Wisler the property described in Count 23 of the Indictment; (2) Bryant did so knowingly and willfully by extortion; and 3) as a result of Bryant's actions, interstate commerce or an item moving in interstate was obstructed, delayed, or affected. See Model Instructions 6.18.1951; Driggs, 823 F.2d at 54.  As there is no real dispute as to the first and third elements, I will focus on the second element.

As to extortion under color of official right, the Government must show that " a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." United State v. Urban, 404 F.3d 754, 768 (3d Cir. 2005).  While the Government need not prove an explicit *quid pro quo*

arrangement, it does, however, need to prove that the payments or other consideration were extended to the public official "to secure unwarranted favorable treatment in his official capacity." Antico, 275 F.3d at 259.  In that sense, passive acceptance of a benefit is a sufficient basis for extortion under the Hobbs Act, so long as the official knows that he is being offered payment in exchange for his ability to take official acts.  See Model Instructions 6.18.1915-6; United States v. Della Donna, 366 Fed. Appx. 441, 450 (3d Cir. 2010).

## II.  DISCUSSION

Having explicated the relevant legal considerations that I must take into account, at the outset, I note that to convict Bryant of all three types of criminal conduct alleged in the Indictment, the Government must overcome the hurdle of proving beyond a reasonable doubt that Bryant intended to be influenced, or knew that he was offered the stream of payments by Wisler, in the form of a retainer agreement, in exchange for favorable official action.

To establish Bryant's alleged corrupt intent, the Government must prove beyond a reasonable doubt that either (1) it was Bryant's conscious desire or purpose to act in a certain way or to cause a certain result, or that (2) Bryant knew that he was acting in that way or would be practically certain to cause that result.  See Model

Instructions 5.03; see United States v. Wolfe, 461 Fed. Appx. 122, 126 (3d Cir. 2012).  I start with the premise that the intent with which a person acts at any given time may be difficult to prove directly.  Rather, intent can be proven indirectly from the surrounding circumstances.  See Id. at 5.01. This case is no exception; the Government advocates that I consider circumstantial evidence and draw reasonable inferences therefrom regarding what Bryant did and failed to do, how Bryant acted, and all the other facts and circumstances shown by the evidence that may prove what was in Bryant's mind at that time.

However, sometimes different inferences may be drawn from the same set of facts.  So, when considering circumstantial evidence in this context, I am cognizant that if the evidence in the case can be viewed as reasonably permitting either of two conclusions – one of innocence and the other of guilt – I must adopt the conclusion of innocence. See Thompson v. Kelchner, 46 Fed. Appx. 75, 82 (3d Cir. 2002).  Indeed, "[e]vidence is insufficient to sustain a conviction where it is wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt." United States v. Marti, 294 Fed Appx. 439, 444 (11th Cir. 2008)(quotations and citations omitted).  Simply put, the existence of a reasonable

innocent explanation of the evidence creates reasonable doubt.  <u>See</u> <u>Thompson</u>, 46 Fed. Appx. at 82; <u>Ridenour v. United States</u>, 14 F.2d 888, 892 (3d Cir. 1926) ("Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused.").

Turning to the Government's case, the prosecution essentially argues that Wisler reached out to Bryant because Cherokee was facing intense community opposition to its project in Cramer Hill and thus, required various official acts to ensure the success of the project. The Government theorizes that at the June 8, 2004 meeting, Wisler and Bryant entered into a bribery scheme whereby Bryant would be paid monthly, disguised as a Retainer Agreement, in exchange for favorable official acts.  Particularly, the Government submits that the following evidence tends to prove that Bryant intended to act corruptly: Bryant concealed the existence of the Retainer Agreement; the Zeller Firm made no effort to perform any of the work specified in the Retainer Agreement; Wisler repeatedly requested Bryant to take official action to benefit Cherokee; and Bryant consistently voted, took other official action, and refrained from official action to benefit Cherokee.  Having considered all the evidence adduced at trial, I find that the prosecution has failed to provide

-24-

a sufficient evidentiary basis upon which I could infer that Bryant acted with the requisite corrupt intent. I will discuss each of the Government's theories in turn.

### 1.    The Retainer Agreement

I deal first with the Government's position that because Bryant and the Zeller Firm never performed any work under the Retainer Agreement, that agreement must have been a sham. However, the evidence also supports a different interpretation. In June 2004, Wisler reached out to Bryant through Salema. (Tr. V. 10, p.77.) Before then, Wisler and Bryant were neither personally nor professionally acquainted. In fact, after the June 2004 meeting, Bryant and Wisler did not meet again in person. (Id. at pp. 78-79, 114; Tr. V. 9, pp. 126-133.) This was not unusual as Bryant did not perform any substantial legal work pursuant to the Retainer Agreement; indeed, Wisler did not request any legal work to be done. Pursuant to the Retainer Agreement, Bryant agreed that the Zeller Firm would assist Cherokee and Wisler in work related to "real estate, condemnation, land use, bank finance and litigation matters on EnCap's Meadowland Project - Phase II, as well as the mixed-use development project to be undertaken in the Borough of North Arlington." (GX 34A, p. 1.) Importantly, the Retainer Agreement did not cover any geographic area in Bryant's senate district.

Also, the agreement covered future urban projects, both in-state and nationwide, in which Cherokee would be involved, including the USCM projects.  (Id.)  On its face, the Retainer Agreement was executed by the parties to put the Zeller Firm on "retainer," and in that regard, it contemplates future legal work.

However, as the testimony revealed, while the Zeller Firm was retained and paid by Cherokee for over two years, the projects covered by the agreement never materialized to the stage where the Zeller Firm's expertise was needed.  (Tr. V. 2, pp. 129-130; Tr. V.4, pp. 147, 158.)  In fact, as late as 2007, Cherokee was still facing issues with North Arlington regarding their Phase II redevelopment contract. (Tr. V.4, p.122.)  And, the partnership between USCM and Cherokee did not develop significantly during the years when the Zeller Firm was retained by Cherokee. (Tr. V.13, p. 61.)  Based on those circumstances, it is not unreasonable that Wisler did not request Bryant's firm to perform any substantial legal work.  Moreover, on its face, there is nothing illegal about a monthly retainer agreement.[13]

The Government, nevertheless, introduced evidence which tends

---

[13]

     Indeed, it is not surprising that state legislators, who are also attorneys, are hired or retained by municipalities, developers or high profile clients to provide legal representation, perhaps in part, for their political acumen.

-26-

to demonstrate that the DeCotiis Firm was primarily responsible for performing all legal work related to Cherokee's projects in New Jersey.  In that connection, the Government argues that there was no need for Wisler to obtain the assistance of the Zeller Firm on legal matters, and indeed, there is no evidence of any discussion between lawyers from the DeCotiis and the Zeller firms regarding work or potential work pursuant to the Retainer Agreement. Moreover, the Government points to the portion of Salema's testimony wherein he testified that according to his impression, Wisler retained Bryant, not for the purpose of seeking legal assistance, but rather, to trade on Bryant's reputation as a state senator. (See Tr. V.10, p.105.)

While there is no real dispute regarding this aspect of the Government's evidence, having evaluated this type of evidence, I do not find that it is dispositive in proving Bryant's alleged corrupt intent.  Instead, this evidence is more probative of proving Wisler's intent to influence.  Phrased differently, the evidence tends to prove the motivation behind Wisler's actions rather than those of Bryant.  Importantly, however, Wisler's intent cannot be imputed to Bryant in a bribery context – the Government has to separately establish the official's own intent.  See Bryant, 655 F.3d at 240-41; United States v. Leahy, 445 G.3d 634, 656 (3d Cir.

2006).  When judging Bryant's intent in this regard, I need not make a separate finding of Wisler's intent.

The Government also stressed that because the Zeller Firm only did work in southern New Jersey, it is suspicious that Bryant signed on for work in the Meadowlands region.  With respect to Bryant's motivation in entering into the Retainer Agreement, it is clear that the Zeller Firm relied on Bryant's ability to bring business into the firm. (See Tr. V.2, p. 50.)  Although the Zeller firm was a smaller regional law office, it nonetheless welcomed work outside of its typical geographical region (see Tr. V.2, p.57); according to Zeller, Bryant's former law partner, the firm was willing and able to accept such prospects.  In that regard, Zeller, who knew of the existence of the Retainer Agreement in 2004, felt that the work described in the agreement was a wonderful business opportunity. (Id. at pp. 58-59.)  Zeller further represented that he did not believe that the agreement was in any way unusual. (Id. at p. 65.) Therefore, the acceptance of work by Bryant outside of the Zeller Firm's typical geographic region was not aberrational, but a sound business decision for the firm.  This plausible explanation is contrary to the Government's assertion that the evidence can only lead to the conclusion that Bryant never contemplated working outside of that area, or that Bryant intended to enter into the

Retainer Agreement for an illegal purpose.

Having reached those conclusions, I will now address the Government's theory of concealment. The prosecution maintains that the strongest evidence showing that the Retainer Agreement was a sham were the efforts that Bryant and Wisler took to conceal the agreement from the public eye. The Government painstakingly outlines the steps Wisler took to conceal the agreement from the DeCotiis Firm. Indeed, "no attorney employed at [the DeCottis Firm] . . . with the exception of [Wisler], recalls being aware of the existence of the Retainer Agreement." (GX3005.) While no attorneys at the DeCotiis Firm were apparently aware of the agreement, at the time it was executed, Wisler sent copies of the agreement to, inter alia, Fusco at Cherokee. Regardless, as I have explained previously, any efforts Wisler may have made to conceal the Retainer Agreement tend to prove his intent to influence rather than Bryant's intent to be influenced.

Furthermore, I find that the Government's evidence regarding Bryant's alleged efforts at concealment is unconvincing and lacking. Zeller testified that he was aware of the Retainer Agreement when he appended Bryant's signature to the agreement on September 7, 2004. (Tr. V.2, p. 14.) Zeller further testified that he did not view the agreement as unusual. Also, since Zeller was the only

equity partner, besides Bryant at the firm, no other attorney would have had to have been informed of the arrangement.  Nor did Bryant ask Zeller to take any steps that would have concealed the agreement from the rest of the firm. (Id. at p. 65.)  In addition, there is no testimony that Bryant instructed anyone to hide the terms of the agreement. (See Tr. V.1, pp. 103-06.)  In fact, various people knew of its existence. (See, e.g., Id. at pp. 58, 60, 139, 104, 129; Tr. V.2, P. 10; Tr. V.4, pp. 144, 150; Tr. V.3, pp. 177-180; Tr. V.11, p. 190; Tr. V.8, p. 84; Tr. V.10, p. 134.)

The Government also points out that Bryant did not disclose the relationship he had with Wisler and Cherokee to anyone at the legislative level.  However, as a general matter, legislators did not disclose the identities of their clients for the sake of confidentiality. (Tr. V.7, pp. 34, 76.)  As Primas testified, Bryant did not discuss the Zeller Firm's clients with him because of this duty.[14] (Primas Tr. P. 148.)  And, to the extent that there were specific circumstances when Bryant was voting in the legislature that could potentially impact Cherokee, and he failed

---

[14]

The Government also questions Bryant's lack of disclosure regarding his relationship with Cherokee in connection with the $1 million that the CRA received as a result of Bryant's legislative efforts.  As will be detailed further in this decision, this lack of disclosure is not particularly probative of a corrupt intent of bribery, but rather, a conflict of interest.

to reveal his attorney client relationship, that would more appropriately point to Bryant failing to disclose a conflict of interest rather than concealment.

In short, nothing in the record convinces me that Bryant affirmatively attempted to conceal the Retainer Agreement. Rather, unremarkably, the monthly retainer checks sent by Wisler were deposited into the Zeller Firm's account in the normal course of business. (GX1200.) Furthermore, Bryant's secretary, Phyllis Bozek, testified that Bryant neither instructed her to keep the Retainer Agreement hidden, nor handle it in a different manner. (Tr. V.1, pp. 157-59.) Indeed, while the Government highlights that certain invoices were drafted by Wisler rather than the Zeller Firm, Bryant did not partake in the preparation, drafting, sending, receipt, review, or processing of any invoices generated in accordance with the Retainer Agreement. (Tr. V. 1, p. 161-63.) Because of the lack of evidence regarding Bryant's, as opposed to Wisler's, efforts to conceal, the Government's concealment theory to prove Bryant's intent necessarily falls short.

## 2.   Official Action

Next, the Government places significant emphasis on the official actions Bryant took during the time period his firm was retained by Wisler. Specifically, the Government argues that the

-31-

only plausible explanation for the official actions that Bryant took, which favored Cherokee, is that he took those actions intending to further the alleged bribery scheme. Before I address this issue, however, as I indicated earlier, see supra, n.12, the parties dispute whether under Wright, the Government must prove that Bryant took official acts that he would not otherwise have taken but for the alleged scheme. Since I need not resolve this legal dispute, I am evaluating the Government's evidence solely for the purpose of ascertaining Bryant's intent, and not determining whether Bryant would have acted a certain way in the absence of the alleged bribery payments.

Initially, I will discuss briefly the official actions that Wisler allegedly requested Bryant to take. At trial, the Government introduced a series of emails exchanged between Wisler and various Cherokee-related personnel after the execution of the Retainer Agreement. (See, e.g., GX2041; GX2044; GX2047; GX2053; GX2055; GX2057; GX2059; GX2065; GX2073; GX2077.) Without delving into the details of each email, essentially, in that correspondence, Wisler instructed others, including Salema, to contact Bryant and other state legislators regarding certain bills pending in the legislature, which either benefitted or harmed Cherokee's interests. In connection with those interests, Wisler advised these personnel

-32-

to "touch base" with the legislators and garner their "attention." See Id. The Government suggests that these emails, which did not involve work outlined in the Retainer Agreement, constitute communications between Wisler and Bryant to further their alleged scheme.

There are numerous issues with this type of evidence. Based on their content, the emails do not explicitly state that Wisler was asking Bryant to take certain official acts; rather, the emails were sent to instruct others to get the attention of various legislators, including Bryant. In that regard, the emails are susceptible to different interpretations - that is, these emails could be construed as legitimate lobbying efforts on the part of Cherokee directed at various legislators, including Bryant. Perhaps, more crucially, there is a lack of evidence connecting these emails to Bryant himself.

Indeed, witnesses, including Salema, testified that they did not recall communicating with Bryant regarding the subject matter contained in the emails. For example, Wisler wrote an email to Bradley Brewster, an outside consultant who worked on Cherokee's New Jersey projects, asking Brewster to reach out to three legislators, including Bryant, regarding certain amendments to brownfield legislation. (See GX 2044.) Brewster testified that he did not

-33-

recall reaching out to Bryant on this issue or any other issues. (Tr. V. 5, pp. 36, 39, 46.)   Similarly, on multiple occasions, Salema testified that he did not recall contacting Bryant on any legislation at the behest of Wisler.[15] (See Tr. V.11., pp. 100, 108, 109-113, 122-23.)   Although the Government introduced certain telephone records which showed that Salema contacted Bryant's legislative office around the time when the emails were sent to Salema by Wisler, the majority of those calls, however, were short in duration, and the calls were answered by Bryant's assistants, not by Bryant himself.  (See DX 39.)  Thus, and more importantly, the Government has failed to show that Bryant spoke with Salema during those calls, let alone the content of what was said.  Indeed, Salema maintained throughout his testimony that he did not speak to Bryant about the subject matter contained in any of the emails exchanged between Salema and Wisler.  (See Tr. V.11, pp. 57-58, 162, 198.)

Without connecting these emails to Bryant, i.e., that he

---

[15]

Donald Sico, President and Chief Executive Officer of Donald Sico & Co., LLC, also worked on Cherokee projects as one of Cherokee's public relations consultants.  Consistent with other witnesses, Sico testified that he did not recall calling Bryant on behalf of Cherokee about any Cherokee matter.  (Tr. V. 7, p. 141.) Moreover, Wisler wanted Bryant's involvement with the Pennsauken project; however, there is no evidence that anyone from the DeCotiis Firm or Cherokee spoke to Bryant regarding this request.  (Tr. V.11, p. 99; Tr. V.4, pp. 13, 80-81.)

received or was made aware of these communications, the Government has failed to prove beyond a reasonable doubt that Bryant was intended to be influenced to take official acts at Wisler's request. Finally, because of the Government's failure to link Bryant to these communications, I have no basis to find or infer that Bryant intended to be influenced in order to further an alleged bribery scheme.

Even less compelling is the Government's position that because certain official acts that Bryant took directly benefitted Cherokee, Bryant must have taken them with the corrupt intent to further the alleged bribery scheme. As evidence, the Government introduced a number of bills that Bryant supported which tended to favor Cherokee. For example, Bryant voted in favor of various bills authorizing a grant of $224 million in Environmental Infrastructure Trust Loans, or otherwise known as EIT loans, which benefitted EnCap Phase I. (See GX102-102B; GX103-103B, 103D, 103F-103G, 103-1; GX113-113B.) However, as the Government concedes, these bills were not only passed unanimously by the State Senate in 2005, they were passed unanimously without debate by all members of the Senate voting from 2002 through 2006.[16] Similarly, Senate Bill 277, which

---

[16]

    Indeed, the 2005 vote for the EIT funding was to re-appropriate the 2004 funding for the same EIT loan.

-35-

expanded the ability for redevelopment projects to receive state grants to cover the costs of remediating hazardous lands, passed unanimously. Therefore, the fact that Bryant's votes were consistent with the agenda of the state Senate – and all other senators –  does not lend any credence to the Government's explanation that Bryant voted the way he did for an illegal purpose or that the had a corrupt intent when considering these bills.

The Government also questions Bryant's silence as to certain eminent domain legislation impacting the Cramer Hill Project. Before analyzing decisions Bryant made in this context, I note, as stated previously, that Bryant was at one time a well-respected and influential senator in southern New Jersey.  (See, e.g., Primas Tr. P.31.)  As a senator, Bryant devoted much of his time to improving the districts he represented, particularly Camden.  (See Tr. V.4, p.27; Primas Tr.  pp. 32, 158-59.)  Consequently, Bryant was known to support legislation that benefitted Camden; he was in favor of the Cramer Hill Redevelopment Plan even prior to entering into the Retainer Agreement.  (See Primas Tr. pp. 38, 127; Tr. V.7, p. 137.)  Indeed, the entire southern New Jersey delegation tended to favor the project when it was first proposed.  (See Tr. V.3, p. 116; Tr. V.5, p.70.)  It is unsurprising that Bryant voted favorably on bills that contributed to the betterment of Camden, including the Cramer

Hill project.[17] (<u>See, e.g.</u>, GX105B; GX104C; GX106C; GX107C; GX102B.)
As such, it would be speculative to find corrupt intent on Bryant's
part merely based on his voting pattern.

For example, regarding eminent domain, legislation was
introduced by Assemblywoman Nilsa Cruz-Perez in an effort to address
public opposition against the Cramer Hill Project.   Cruz-Perez
testified that this bill was introduced in the assembly and she
neither contacted Bryant regarding the bill nor requested his
support.  (Tr. V.12, p. 103.)   Naturally, because this bill was
introduced in the Assembly, not the Senate, Bryant took no action
with respect to supporting or rejecting the legislation.  (<u>Id.</u>)
However, on the issue of relocation, according to Fusco, Bryant had
relayed the concerns of his constituents to Cherokee
representatives; Bryant had requested Cherokee to address those
concerns.  (Tr. V.3, pp. 142, 145.)

Furthermore, contrary to the Government's suggestion, not all
of Bryant's decisions benefitted Cherokee.   In 2006, Bryant
sponsored Bill 1982 which concerned the Commercial Real Estate Tax.
(GX110.)  On its face, this bill would have taxed Cherokee on the

---

[17]

Indeed, having long been involved in Bryant's political
affairs, Primas shared the same sentiment.  (Primas Tr. pp. 158,
160.)

Cramer Hill project.  (Tr. V.4, pp. 99-101.)  While Wisler lobbied

for carve-outs in the bill exempting the Camden project, no carve-

outs were later enacted.  (Tr. V.9, p.71.)  Importantly, there is

no evidence showing that Bryant took any action to introduce or

enact any carve-out provisions in this bill that would have been

beneficial to Cherokee.

In sum, in light of the evidence, there are two ways to

interpret Bryant's official actions:  Bryant voted in such a manner

with intent to fulfill his end of the corrupt arrangement with

Wisler, or – a considerably more plausible conclusion – Bryant's

actions were typical of his legislative agenda.  This innocent and

indeed, more likely, explanation alone creates reasonable doubt.

While the Government asks that I disregard this explanation without

any evidentiary basis for doing so, I refuse to adopt the

prosecution's theory, "where little more than conjecture supports

the hypothesis of guilt."  Marti, 294 Fed Appx. at 444.

Finally, I will comment on the strength and relevance of the

Government's evidence relating to Bryant's vote during the JBOC

meeting on July 7, 2005.  The Government argues that Bryant failed

to disclose to other members of the Committee that $1 million of the

total $37 million transferred to Camden was allocated to the CRA,

some of which would pay for legal bills related to the defense of

-38-

Cherokee's Cramer Hill Project, including the Zeller Firm's condemnation work in Cramer Hill. The Government maintains that the non-disclosure is probative of Bryant's corrupt intent.

During the trial, there was a dispute as to whether Bryant knew that the $1 million would be transferred to the CRA to pay for its litigation expenses. The Government highlights that because the Zeller Firm assisted the CRA in condemnation work, the funding would eventually pay for the firm's legal fees. The Government's assertion is based on Primas' testimony. Primas testified that, on behalf of the CRA, he had requested that Bryant support such funding, and that he informed Bryant that the money would be used for legal expenses. (Primas Tr., pp. 101, 177.)

While I find that Bryant may have had some insight as to the purpose of the $1 million, I do not find that Bryant's non-disclosure to the JBOC – intentional or not – is probative of establishing his corrupt intent as it relates to the alleged bribery scheme between Bryant and Wisler. As the evidence revealed, the $1 million clearly involved the budgets of Camden and the CRA. There is no evidence that Wisler or Cherokee requested that Bryant take certain actions relating to the $1 million. In fact, there is no evidence illuminating how this funding would directly benefit Cherokee. Logically, the money would have benefitted the CRA as it

needed the funding to pay legal and administrative expenses.  (See GX1704; GX1706.)  Indeed, Bryant had been consistently supportive of the CRA.  (Primas Tr., p. 133.)  Therefore, I find that Bryant's legislative efforts to acquire the funding for the CRA were to benefit the CRA, not Cherokee.  However, I also find that, indirectly, the funding would have benefitted Bryant and his law firm because the Zeller Firm had billed legal fees in connection with its condemnation efforts for the CRA.

While Cherokee may have potentially stood to gain from the CRA's litigation efforts, this connection to the CRA funding is tenuous at best and thus, it is an insufficient basis upon which to draw the inference that Bryant acted in this manner to further the alleged bribery scheme.  On the other hand, I note that having considered the evidence on this issue, any non-disclosure on the part of Bryant may well have supported a theory of conflict of interest.  However, the conflict of interest theory has been rejected by the Supreme Court as a proper predicate for honest services fraud; thus, I need not comment further.[18]

---

[18]      The Government offers Bryant's prior honest services fraud conviction – involving a bribery scheme with the former dean of the School of Osteopathic Medicine at the New Jersey University of Medicine and Dentistry – to demonstrate that Bryant had the knowledge, intent and motive to engage in a similar bribery scheme with Wisler.  I will not belabor the Government's evidence in this

### 3.    Salema's Testimony

As I mentioned earlier in this Opinion, other than Bryant, who did not testify at trial, Salema was the only person at trial who was able to testify as to what occurred at the June 8, 2004 Meeting between Bryant and Wisler.   On that issue, Salema's testimony clearly did not reveal that Bryant and Wisler had agreed to a *quid pro quo* arrangement.  (See Tr. V.11, p.162.)  As to certain portions of Salema's testimony, the Government vigorously questions Salema's credibility because the Government argues that he stands to personally gain from hiding the truth.[19]   However, I find it difficult to adopt the Government's position because the prosecution never offered any testimony contrary to Salema's version of events.

Indeed, the majority of Salema's testimony was either uncontradicted or corroborated by others.   In other words, this is not an instance where the Government is asking the Court to credit another witness' testimony over Salema - there remains no direct evidence that proves Bryant and Wisler engaged in a bribery scheme.

_____

context.  I have already found here that there is a lack of evidence to prove beyond a reasonable doubt that Bryant had the requisite intent to engage in an illegal scheme here.   Bryant's prior conviction does not tip the balance.   See United States v. Heath, 456 Fed. Appx. 102, 104 (3d Cir. 2011).

[19]

Salema testified at trial under a Court Order of compulsion and grant of immunity.

Rather, the prosecution is requesting that I discredit portions of Salema's testimony based on the Government's unwavering belief that Salema must be wrong because otherwise it would negate Bryant's guilt.   I decline to do so because I do not find that there are sufficient indications supporting the suggestion that Salema provided false testimony.

### III. Summary

The Government has strung together an unconvincing web of circumstantial evidence in an attempt to prove that Bryant intended to be influenced by Wisler.   Each link connecting these pieces of evidence is based on inferences the prosecution has asked me to draw.   However, I do not find that the Government's suggested inferences of guilt convincing.   The evidence was subject to different interpretations, and each inculpatory interpretation the Government places on a fact in question, as I have discussed above, there seems to be a competing – and more likely – innocuous one.

For example, the Retainer Agreement, on its face, was valid and legal.   While the Government has surmised that it was a sham, there was little or no evidence which would lead me to find that Bryant and his firm were not willing and able to perform the work outlined in the agreement or that Bryant entered into the agreement with corrupt intent.   As for the official acts that Bryant took,

some of which may have benefitted Cherokee, there was nothing to suggest that these outcomes were the result of a corrupt arrangement between Bryant and Wisler. Instead, they were consistent with Bryant's political stance, and often, the entire state Senate, which tends to negate the Government's assertion of a corrupt intent. What is more, the Government's evidence of Bryant's concealment of the Retainer Agreement was lacking.

Consequently, I find that the Government has not proven beyond a reasonable doubt that Bryant acted with corrupt intent when he entered into the Retainer Agreement and accepted the retainer payments, or that he even had knowledge that the payments made pursuant to the Retainer Agreement were intended to be exchanged for his official acts. Because there is reasonable doubt as to Bryant's intent, the Government has failed to carry its burden of proving Bryant's guilt. Hence, I **ACQUIT** Bryant of all charges.

An appropriate Judgment shall follow.

DATED: August 10, 2012                    /s/ Freda L. Wolfson
                                          **Hon. Freda L. Wolfson**
                                          **Unite States District Judge**